In this case the plaintiff police officer was injured when allegedly attacked by a dog belongs to the defendant Greenwood. Greenwood, at the time of the incident was housesitting for a period of several months for the defendant Lindsay while he and other family members were in Florida. In March 1997, Greenwood, while attempting to leave the premises, activated a burglar alarm which was monitored by an outside service. Greenwood in fact left the premises, the monitoring service notified the Weston Police Department of the alarm activation, and the plaintiff went to investigate the problem. Upon arrival at the Lindsay residence CT Page 5402 the plaintiff claims to have beer suddenly attacked by Greenwood's dog causing him to fall backward onto a concrete urn adjacent to the walkway on the Lindsay residence. The plaintiff claims to have suffered injury as a result of these events and in this action has sued Greenwood, the dog owner, and Lindsay. The allegations against Lindsay in the Second Amended Complaint are set forth in three counts.
The Second Count alleges liability under the Dog Bite Statute, § 22-357 claiming Lindsay was a "keeper" of the dog owned by Greenwood. The Fourth Count makes a claim of vicarious liability for Greenwood's negligence. It alleges Lindsay was the "principal/master/employer" of Greenwood. The Fifth Count of the Second Amended Complaint is based on negligence. This count claims Lindsay was negligent in that he allowed the dog to roam on the property and that in doing so the dog forseeably would harm someone and that he took no precautions to determine the vicious propensities of the dog. He knew or should have known the dog had such propensities and it was reasonably forseeable that it would cause harm to people such as the plaintiff. It is also alleged that Lindsay allowed Greenwood, his "housesitter, to permit the dog to roam thus usurping his obligation to ensure that persons lawfully on his property would be prevented from reasonably forseeable harm when it was his obligation to take steps to do so.
The defendant has filed a motion for summary judgment against each of these counts. The standards to be applied on motions for summary judgment are well established. The court cannot attempt to resolve genuine issues of material fact that remain after examining all appropriate materials submitted to the court pursuant to the motion. The resolution of such issues are for the jury and the nonmoving party has a constitutional fight to a jury trial. On the other hand to avoid burdensome litigation the court should grant such a motion where there is no genuine issue of material fact. The court has an obligation not only to the moving party to do so but also to other litigants who might experience delay in resolving their cases if unmeritorious actions are allowed to crowd the dockets of already busy courts.
 1.
The second count lies under the so-called dog-bite statute, § 22-357 of the general statutes. The plaintiff does not allege Mr. Lindsay was the "owner" of the dog under the statute CT Page 5403 but that he was the "keeper" of the dog. Section 22-327 (6) defines "keeper" as "any person, other than the owner harboring or having in his (sic) possession any dog." It is undisputed that Greenwood house-sat for Lindsay and that she owned a dog which Lindsay knew she had with her at his home. In his affidavit, Lindsay said Greenwood had possession and control of the dog; she fed, cared for, and controlled the dog's activities on his property. On the day the incident and for several months prior to it, Mr. Lindsay states that he and his wife had been out of ate. The plaintiff does not contest any of the factual assertions of the defendant Lindsay but, in fact, relies Lindsay's affidavit to argue that in permitting Greenwood to have her dog on the property for an extended period of time Lindsay was the dog's keeper — in effect he provided shelter, lodging and refuge to the co-defendant's dog. Mere acquiescence in the presence of a dog on one's premises or over premises concerning which a person has control should not make that individual a "keeper" of a dog under the statute.
Thus, in Buturla v. St. Onge, 9 Conn. App. 495 (1987), the court held that mere acquiescence by the landlord of the dog's presence on leased premises could not establish the landlord's liability under the statute absent any evidence of caretaking of the dog actual control of the dog. The court concerned itself h the definition of "keeper" set forth in § 22-327 (6) particularly with that portion of the definition involving "harboring" of the dog. In Buturla, as here, there can be no claim that Lindsay, although not an owner, had the dog in his possession (see full definition of keeper).
The Buturla court first noted the Webster definition "harbor" which defined the word to mean "afford lodging, to shelter, to give refuge to" but then adopted the somewhat narrower definition from Corpus Juris Words and Phrases. The court then went on to refer to Hancock v. Finch, 126 Conn. 121 (1939) and at page 498 the Buturla court said:
 "In Hancock v. Finch, supra 123, the court stated that possession cannot be fairly construed as anything short . . . of dominion and control . . . We find, as did the trial court that in order to harbor or possess a dog, some degree of control over the dog must be exercised." (Emphasis added.)
(See also Murphy v. Buonato, 42 Conn. App. 239, 244 (1996), CT Page 5404 which also emphasizes "control" and cites Buturla.)
Also in Falby v. Zarembski, 221 Conn. 14 (1992), court said the Appellate Court in Buturla adopted a view similar to its own,id. p. 20. In Falby the court reversed a judgment for the plaintiff in a dog bite statute case where the facts showed that the defendant home construction company knew that the employee dog owner "was in the habit of bringing the pit bull terrier with him to various work sites, that it acquiesced in the presence of the dog at these sites that it could have prohibited (the dog owner) from bringing the dog with him to work if it so desired,"id. 19. There could be no liability under § 22-357 because there was no evidence that the defendant company:
. . . fed, watered, housed or otherwise cared for the plaintiffs claim, control over the premises where the dog inflicted the injuries or over (the dog owner) by virtue of the employment relationship did not convert (the defendant company) into a keeper of. . . (the) dog while it was present at the work site. Id. pp. 19-20.
Control of the dog is the key factor and Falby seems to go even further than Buturla in the sense that in Buturla the court said its analysis agreed with that set forth in Bailey v. DeSanti36 Conn. Sup. 156 (1980). In Bailey the landlord was found to have "harbored" a dog allowed to stay in a common area of the leasehold. Query whether under Falby, which put its emphasis on actual control of the dog, the Bailey case is still good law. But, even Buturla, in commenting with approval on Bailey noted that in Bailey the dog was kept in a common area under the "direct control" of the landlord who apparently was living on the premises at the time of the incident.
In this case there is no evidence Lindsay ever exercised any control over this dog even though the dog was permitted to stay on the premises. Since actual control of the dog is the deciding factor under the appellate cases even if Greenwood were to be considered an employee or agent that would not change the definitional requirements of a "keeper" or of a "harborer" of the dog under the statute, see Falby v. Zarembski, supra at221 Conn. pp. 19-20. And even if Bailey is still viable, here the Lindsay family was not in possession of the property at the time of the incident but was in Florida so Lindsay cannot be said to have been in direct control of the property — in terms of actual control at the time of the incident — and therefore somehow in CT Page 5405 control of the dog.
The motion is granted as to the Second Count which makes a claim under § 22-357 of the general statutes.
 2.
In the fourth count the plaintiff incorporates several factual and legal allegations of earlier counts in the revised complaint. The fourth count alleges Lindsay owned the residence at issue and that he "entered into an arrangement" with Greenwood whereby the latter agreed to housesit while he and his family were out of state for several months. Greenwood owned a dog Lindsay was aware of this and he "permitted her t( take with her and maintain care and custody and control of the dog while she was at his residence Greenwood when leaving the house on March 25, 1997 activated a burglar alarm connected to an outside service. The service notified the police of the alarm, the plaintiff officer went to the house to investigate. While there he was attacked by the dog apparently outside the house and fell backward onto a concrete urn which caused him injury. The count goes on to allege Greenwood was negligent in a variety of ways: (1) she allowed the dog to be maintained on the premises without ensuring it would be confined; (2) she allowed the dog to roam on the premises when she knew or should have known that in doing so it was reasonably likely, he dog would attack someone; (3) she took no precautions to determine whether the dog had vicious propensities so as to ensure that she could prevent harm to others because of those characteristics of the dog. As a result of this alleged negligence the plaintiff alleges he suffered a variety of injuries. The fourth count concludes with the following paragraph:
 14. At all relevant times herein the defendant Charles Lindsay was the principal/master/employer of the defendant Teresa Greenwood.
The defendant Lindsay also directs his motion of summary judgment at this count. The defendant argues that to be vicariously liable the plaintiff must establish two elements: (1) that Greenwood was an employee of Lindsay: and (2) that she was acting within the scope of that employment, Levitz v. Jewish Homefor the Aged, 156 Conn. 193, 198 (1968) is cited.
 A. CT Page 5406
The defendant keying in solely on the "employer" allegation of paragraph 14 notes that Webster defines an employee as someone who receives wages; a person who works with no expectation of compensation certainly would not be an employee for workers' compensation purposes argues the defendant. France v. Munson,125 Conn. 22, 35 (1938). The defendant submitted an affidavit to the effect that he denied any employer-employee relationship existed between him and Greenwood and she received no pay. The plaintiff as not contested these allegations.
Furthermore, the defendant argues that the "plaintiff has presented no evidence that the co-defendant's Greenwood's) actions in connection with her dog were within the scope of any alleged employment relationship or for the benefit of the defendant Lindsay" citing Brown v. Housing Authority,23 Conn. App. 624, 628 (1990).
 B.
As noted the defendant concentrates on only one allegation of the fourth count that Lindsay was Greenwood's employer and argues that no employment relationship exists thus one essential element to establish vicarious liability has not been supported by anything submitted by this plaintiff. However, the plaintiff also alleges a principal-agent, master-servant relationship both of which, if established, can form the basis of vicarious liability. But the employer-employee relationship is only one subcategory of agency type relationships. Our court accepts the Restatement Second) Agency definition of the agency relationship; Section 1 states that "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his (sic) behalf and subject to his (sic) control, and consent by the other so to act," see Beckenstein v.Potter Carner, housesitting. At her deposition, Greenwood testified that she and her husband housesat for the Lindsays while they were in Florida — they were to watch the house while the Lindsays were gone and take the mail. If specific mail was needed by Lindsay, Greenwood would forward it to Florida. She was given a "whole list" of "normal" household things that had to be taken care of such as the temperature to be maintained in the house, the Greenwoods cut the grass while they were there and put grass seed down — they were paid for the grass seed.
Greenwood acted on Lindsay's behalf in housesitting for him CT Page 5407 while he and his family were out of state, in doing that task she acted subject to his control — he gave her various instructions, she performed tasks at his request and the terms on which she occupied the house were to some extent dictated by him for example as to where the dog was kept and allowed to go. She consented to do these things and this consent is shown by the fact that her deposition testimony reveals that she complied with various matters and tasks that were to Lindsay's benefit. That is all that the establishment of the agency relationship requires. And the Restatement makes clear that such a relationship and the subcategory relationship of master-servant can be created even though the agent or servant does not receive consideration, cf. Restatement (Second) Agency at § 16 and § 225, also see dicta to this effect in Kurtz v. Ferguson, 104 Conn. 257, 268-69
(1926). In any event "consideration" is a term which can be broadly defined. True there is no indication Greenwood received cash or other valuables for living in the house nor was there any agreement to provide such in the future. Greenwood did not have to live in the home, she could have lived with her parents. But the fact remains that in return for housesitting at the Lindsays she was permitted to live in the house and obviously take advantage of the shelter and comforts that a house provides.
 C.
But merely because an agency relationship is established that does not necessarily impose vicarious liability on the principal for the torts of the agent against third persons. Preliminary it is necessary to ascertain whether Greenwood was a servant or a nonservant agent. This distinction is important at least for the application of Restatement rules regarding vicarious liability. Section 2 defines a servant as an agent employed by a master to perform a service whose physical conduct is controlled or subject to the right of control by the master. The commentary to Section 218 at page 479 says that: The nonservant agent agrees sometimes to render services and sometimes to achieve results, but he [sic] does not surrender control over his (sic) physical actions. Household servants and full-time employees of a business are t should be noted that the Restatement uses "employed" in an informal way. It "is not intended to connote a contractual or business relation between parties." Subsection (b) of Section 220 of Restatent (Second), Agency at page 486; also see § 225, a person serving gratuitously can be a servant.
In any event, giving the legal inferences that can be drawn CT Page 5408 from the facts that reading which is most favorable to the plaintiff, the court will assume a master-servant relationship is involved here. That type of agency relationship applies the broadest scope of vicarious liability on the type of principal involved, i.e., the master. To house sit, the Greenwoods had to in the Lindsay home. That is necessarily entailed the type of service performed. This obviously limits sets a parameter to the physical conduct of these people. They cut the grass and picked up the mail, they did "normal house things" pursuant to a list provided by Lindsay which involved them taking certain physical actions. The dog was allowed on the premises but the Greenwoods had restrictions placed on them as to where and when he could occupy and use certain portions of the premises.
As noted then, the court will assume for the purposes of discussion that a master-servant relationship listed here. But merely because Greenwood can be aracterized as a "servant' that does not mean Lindsay would be responsible for all her actions or failures act.
Under general agency law, a master is subject to liability for the torts of his or her servant committed while acting in thescope of that servant's employment. Restatement, § 291(1),Levitz v. Jewish Home for the Aged, supra at 156 Conn. page 198,Ritchie v. Waller, 63 Conn. 155, 160 (1893). (Emphasis added.)
The concept "scope of employment" is defined in Section 228 of the Restatement; comment (a) at page 504 says that: "The word "employment" means the subject matter as to which the master and servant relationship exists. Levitz v. Jewish Home for the Aged, supra at page 198 quotes with approval language from a federal case which further defines this comment from the Restatement.Pacific Telephone Telegraph Co. v. White, 104 F.2d 923, 926
(CA9, 1939) id that:" `In the course of his (sic) employment' means while engaged in the service of the master, and not synonymous with the phrase `during the period employment.' "
The facts of Levitz are illuminating on this issue fore the court. In Levitz, an employee of the defendant Home for the Aged was hired as a hospital orderly. He assisted nurses in lifting and feeding pants. He lived in a room on the premises and owned an auto which, on September 1, 1961, he parked in front of the defendant's premises. On that date, he left the room to go to his car which he was going to drive downtown to pay some bills. He started the car which went out of control and struck the CT Page 5409 plaintiff who later sued the defendant Home for the Aged. The court analyzed the evidence and concluded there was no indication the employee was using his car that day to perform an errand for his employer or any other service for it. The court went on to note that even though employment records indicated the employee worked on the day of the accident or had done his usual work that still would not impose liability on the Home for the Aged. The court upheld the trial court's action in setting aside the verdict for the plaintiff against the Home for the Aged because it concluded the employee at the time of the accident was not acting in the "course of his employment" and then quoted the above referenced language from the Pacific Telephone Telegraphcase. The same reasoning is applied when intentional torts are involved and the injured party sues the employer or master under the doctrine of respondent superior. The cases hold that it must be the principal's affairs and not solely those of the agent which are being furthered for the doctrine to apply. The employee or servant must be acting in furtherance of the employer's or master's business. See Larsen Chelsey Realty Co. v. Larsen,232 Conn. 480, 500-01 (1995) (several cases cited for the proposition which the Court sets forth); also cf. Brown v. Housing Authority,23 Conn. App. 624, 628 (1990).
An examination of the deposition in this case indicates that the dog was only on the premises at the requests of the Greenwoods, its owners. The Lindsays knew the Greenwoods had a dog but they never asked that the dog be brought to their house to provide any protection to the home when the Greenwoods were not present. According to the Lindsays' request, the dog was restricted in the areas in the house he could go to when the Greenwoods were at home. When they were not at the house, the understanding was that he would be leashed. In fact, he was tied to a 12 to 15 foot post in the garage. Under these circumstances, it is difficult to see how much unasked for, even gratuitous "protection" the dog gave to the property by its mere presence. It seems evident that having the dog on this property had nothing to do with furthering the Lindsays' interest in having someone to house sit for them. The presence of the dog on the property furthered only the interests of the Greenwoods in having their pet on the property. Section 235 of the Restatement supports the reasoning of Levitz and applies to this case:
§ 235 Conduct Not for Purpose of Serving Master
 An act of a servant is not within the scope of employment CT Page 5410 if it is done with no intention to per form it as a part of or incident to a service account of which [the servant] is employed.[1]
For the foregoing reasons the motion is granted as to the Fourth Count.
 3.
The defendant Lindsay has also directed its motion against the Fifth Count which, except as to subparagraph 13(d) is an ordinary negligence claim against Mr. Lindsay and does not rely on vicarious liability. The claim is made that Lindsay knew Greenwood would be having her dog stay on his premises and he allowed without taking any reasonable precautions to ensure the dog would be confined to an adequately restricted area. He allowed the dog to roam upon the premises when he knew or should have known that this could reasonably and foreseeably cause harm to others. It also alleged that he took no precautions to determine the "vicious propensities" of the dog hereby requiring Lindsay to take reasonable steps to prevent harm to persons lawfully on the premises when he knew the dog did have vicious traits.
The leading case in this area is Morin v. Bell CourtCondominiums Assn., Inc., 223 Conn. 323 (1992). In at case, the trial court's action in setting aside a verdict in favor of the plaintiff police officer was affirmed. Morin makes clear that our state still adheres the rule that a defendant's duty to people entering or her premises is based on the entry status of that person — trespasser, licensee, invitee. Id. pp. 330-31. The court went on to say that: "We will treat as licensees police officers who are on private property in the exercise of their duties." Id.
p. 328. The Morin case pages 329 through 334 discusses the rules to be applied in this type of case. If the owner has actual knowledge of the licensee police officer's presence, the owner has a duty to warn the licensee of dangerous conditions which the owner knows about but which the owner cannot reasonably assume the police officer knows or, by reasonable use of his or her faculties, would observe. Id. page 329. Here, Lindsay submitted affidavit indicating he did not know of the officer's presence on his property — he was in Florida at the time of the incident. Thus, in order to establish liability under Morin's reasoning and the so called firefighter's rule, the plaintiff must establish that Lindsay had constructive knowledge" of the officer's CT Page 5411 presence on premises — in fact, the plaintiff must show `a level knowledge 'equivalent to actual knowledge.'" Id. p. 9. Morin cites Haffey v. Lemieux, 154 Conn. 185, 266), as the "seminal Connecticut decision" in this a. There a postal delivery employee tripped on a defective stair. He had to use the stairs to get to the mailbox which the court concluded the defendant knew or should have known — he had lived at the house several months — and the defendant also knew of the integrating condition of the stairs. The Morin court adopted Haffey's view of constructive notice and quoted from page 189 of that decision to the effect that:
. . . where, as here, the presence of the licensee at the approximate time and place of injury reasonably could and should be anticipated by the licensor, this should be regarded as the equivalent of
The court in Morin went on to note that in the case before it the plaintiff "failed to establish that there was a predictable pattern or prior usage by himself or other police officers in his stead. . . [the plaintiff] did not establish any dates for his or other officer's visits to the premises." He also did not show that he or other officers had gone to the particular building [one of four] at which the injury occurred. The court said constructive knowledge can be established without that frequency of visits akin to those made by a mail carrier but the plaintiff still had to establish "that the visits were reasonably regular and predictable such that s they became the equivalent of actual knowledge. The police had visited the location 20 to 30 times but the plaintiff "established no pattern of regularity with respect to specific dates, times and places of their visits at the condominium complex." Id. p. 231.
In this case, Mr. Lindsay, in his affidavit, stated he had no knowledge that there was any problem with the alarm system. The plaintiff, in his deposition, indicated he had no recollection of ever having been called to the property before this incident. He said the police secretary, who receives notice from the monitoring company when an alarm goes off, indicated to him the alarm at the Lindsay property had gone off once or twice in the past. There is no indication that officers had been dispatched to the scene as opposed to clearing the matter up with a call to the residence.[2]
The plaintiff cites Apuzzo v. Fecks, 16 CONN. L. RPTR. 575 CT Page 5412 (1996), in support of his argument that the so-called firefighter's rule does not apply. This court wrote that opinion which goes as far as permissible in sustaining a claim made by a police officer in a case such as this. This is not the Apuzzo case. There, over a period of several years, the police had responded to an alarm 17 times and the court reasoned, to make sure the facility was secure, any officer would have to follow a prescribed path around the building to check the various doors. There was a depression in the prescribed path that made its use dangerous.
In this case, as noted, it is not clear any officers had ever been dispatched to the residence because of the alarm system — if they had, it happened on no more than one or two occasions. More to the point and unlike Apuzzo, there has been nothing presented to the court that any owner would know or have reason to know that any officer responding to an activated alarm would have positioned himself close enough to the garage to permit the dog to leap on him causing him to fall and suffer injury. Lindsay in fact required Greenwood to have the dog on a leash when she and her husband were not at home.
The court grants the motion as to the Fifth Count.
CORRADINO, J.